**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY**

| | |
|---|---|
| KEVIN JOHNSON, individually and on behalf of all others similarly situated, | |
| Plaintiff, | **CASE NO. _____** |
| v. | **CLASS ACTION COMPLAINT** |
| SHOP-VAC CORPORATION, | **JURY TRIAL DEMANDED** |
| Defendant. | |

Plaintiff Kevin Johnson brings this action on behalf of himself and all others similarly situated against Defendant Shop-Vac Corporation ("Shop-Vac" or "Defendant"). Plaintiff makes the following allegations pursuant to the investigation of his counsel and based upon information and belief, except as to the allegations specifically pertaining to himself, which are based on personal knowledge.

## NATURE OF THE ACTION

1.      This is a putative class action lawsuit regarding Defendant's false and misleading labeling and packaging of Shop-Vac brand vacuums (collectively, the "Vacuums," as enumerated below). The labeling and packaging of the Vacuums are replete with false and misleading horsepower ("HP") claims, namely that the Vacuums can purportedly achieve "2.5 Peak HP," "3.0 Peak HP," "4.5 Peak HP," "5.0 Peak HP," "5.5 Peak HP," "6.0 Peak HP," or "6.5 Peak HP" (collectively, the "HP Claims"). Defendant misleads consumers into believing that the Vacuums can generate up to 6.5 horsepower, even though the HP Claims are illusory and can never be obtained in actual use. In doing so, Defendant is able to charge a substantial price premium on account of these fictitious horsepower claims.

2.      It is physically impossible for any of the Vacuums to achieve a horsepower output anywhere close to Defendant's HP Claims.  The true horsepower of the Vacuums is only a small fraction of the HP Claims.  According to the electrical rating Shop-Vac permanently marks on the Vacuums, and pursuant to testing performed by Underwriters Laboratories ("UL"), a prestigious third-party laboratory specializing in electrical appliances with whom Defendant Shop-Vac collaborated prior to the sale of the Vacuums, the total electrical power input possible at any instance for the "6.5 Peak HP" models is only 1440 watts.[1]  If the electrical power is perfectly converted by the Vacuums' motors, which it is not, the total possible output power of the Vacuums is only about 1.931 horsepower (one horsepower equals about 745.7 watts).  This is a 70.3% reduction from the "6.5 Peak HP" claim.  As another example, the total electrical power input possible at any instance for the "2.5 Peak HP" models is only 960 watts, or about 1.287 horsepower.  This is a 48.5% reduction from the "2.5 Peak HP" claim.  In fact, the standard NEMA 5-15 receptacles (*i.e.*, 3-prong wall outlets) found in American homes, and the NEMA 5-15 plugs (*i.e.*, 3-prong plugs) found on the Vacuums, are never rated for more than 1800 watts and 0.5 horsepower, respectively.  Thus, Defendant's HP Claims are unobtainable, under any conditions.

3.      Defendant labeled the Vacuums with false and misleading horsepower ratings because such representations are highly material to consumers and serve to differentiate the Vacuums from competitors' vacuums.  Here, consumers relied on Defendant's horsepower claims, but only received a small fraction of the horsepower ratings advertised and expected.  Consumers, when purchasing their Vacuums, relied on Defendant's horsepower ratings to determine the strength and suction ability of their Vacuums compared to others.  This number,

---

[1] The marked electrical rating is the electrical power the device draws, even in the "most severe conditions of normal use [that] is not a deliberate overload."  Even with a 10% underestimate that the UL allows, the horsepower output is significantly below the representation on the products' labeling and packaging.  *Infra* Parts F-G.

which a reasonable consumer assumes is correct, forms a substantial basis of his or her bargain, and in turn allows Defendant to command a price premium for the Vacuums over comparable models.  The higher the horsepower number, the more likely a consumer is to purchase the vacuum over another model, and the more money a consumer is willing to spend.

4.       Plaintiff seeks relief in this action individually, and on behalf of similarly situated purchasers for breach of express warranty; breach of the implied warranty of merchantability; unjust enrichment; negligent misrepresentation; fraud; and violation of state consumer protection statutes, including the New Jersey Consumer Fraud Act ("NJCFA"), the Pennsylvania Unfair Trade Practices and Consumer Protection Law ("UTPCPL"), the Minnesota Prevention of Consumer Fraud Act ("MPCFA"), the Minnesota Uniform Deceptive Trade Practices Act ("MDTPA"), the Minnesota Unlawful Trade Practices Act ("MUTPA"), and the Minnesota False Statement in Advertising Act ("FSAA").

## THE PARTIES

5.       Plaintiff Kevin Johnson is a citizen of Wisconsin, residing in Hudson, Wisconsin. In or about June 2018, Plaintiff Johnson purchased a Shop-Vac brand vacuum, specifically the "Shop-Vac® 16 Gallon 6.5 Peak HP Stainless Steel Contractor Wet Dry Vac" with a "Catalog No. of 9627810" and "Model No. of 992LSQ650" from a retail store, Menards at 5800 Krueger Lane, Oak Park Heights, MN 55082.  Prior to his purchase of his Shop-Vac vacuum, Plaintiff Johnson reviewed the product's labeling and packaging and saw that the vacuum purportedly had a horsepower rating of "6.5 Peak HP."  Plaintiff Johnson relied on that labeling and packaging to choose his vacuum over comparable models.  Plaintiff Johnson saw these representations prior to, and at the time of purchase, and understood them as representations and warranties that his Shop-Vac vacuum was capable of producing the claimed "6.5 Peak HP" during normal use and

operation.  Plaintiff Johnson relied on these representations and warranties in deciding to purchase his Shop-Vac vacuum.  Accordingly, these representations and warranties were part of the basis of the bargain, in that he would not have purchased his Shop-Vac vacuum on the same terms had he known these representations were not true.  In making his purchase, Plaintiff Johnson paid a substantial price premium due to the false and misleading HP Claims.  However, Plaintiff Johnson did not receive the benefit of his bargain, because his Shop-Vac vacuum, in fact, does not produce anywhere near 6.5 horsepower.  Plaintiff Johnson also understood that in making the sale, his retailer was acting with the knowledge and approval of the Defendant and/or as the agent of the Defendant.  Plaintiff Johnson further understood that the purchase involved a direct transaction between himself and Defendant, because the purchase came with Defendant's representations and warranties that his Shop-Vac vacuum produced 6.5 horsepower.

6.     Defendant Shop-Vac Corporation is a New Jersey corporation, with its headquarters in Williamsport, Pennsylvania.  Shop-Vac was founded and has been incorporated since 1969.  Since then, Shop-Vac has manufactured and sold vacuums and accessories, including wet/dry vacuums, and is responsible for the advertising, marketing, trade dress, and packaging of Shop-Vac wet/dry vacuums, including the Vacuums.  Shop-Vac Corporation manufactured, marketed, and sold the Vacuums during the class period.  The planning and execution of the advertising, marketing, labeling, packaging, testing, and/or corporate operations concerning the Vacuums and the HP Claims was primarily carried out at Shop-Vac's headquarters and facilities within Pennsylvania, as is most, or all, of the Vacuums' manufacturing and assembly.[2]

---

[2] Shop-Vac's corporate headquarters is in Williamsport, Pennsylvania, as is their primary manufacturing facility. *See* https://www.timesherald.com/lifestyle/pa-proud-shop-vac-outsells-all-wet-dry-utility-vacuums/article_581b33ee-6ee4-5d4a-98e3-38ee9956a7cf.html.

7.     The Vacuums at issue include all Shop-Vac models that purport to have "2.5 Peak HP," "3.0 Peak HP," "4.5 Peak HP," "5.0 Peak HP," "5.5 Peak HP," "6.0 Peak HP," or "6.5 Peak HP:"

A.  Vacuums labeled as having "2.5 Peak HP" or greater in the "Shop-Vac All Around Series" catalogue including:  "Shop-Vac All Around EZ Series" and "Shop-Vac All Around Plus Series;"

B.  Vacuums labeled as having "2.5 Peak HP" or greater in the "Shop-Vac Automotive Series" catalogue including:  "Shop-Vac BULLDOG Series" and "Shop-Vac Professional Series;"

C.  Vacuums labeled as having "2.5 Peak HP" or greater in the "Shop-Vac Hardware Series" catalogue including:  "Shop-Vac Hardware Series," "Shop-Vac Hardware Series SVX2," "Shop-Vac Blower Vac Series," "Shop-Vac Pump Vac," "Shop-Vac Portables," and "Shop-Vac Vac N Vac & Wall Mount Series;"

D.  Vacuums labeled as having "2.5 Peak HP" or greater in the "Shop-Vac Contractor Series" catalogue including:  "Portable Series," "Contractor Series," "Heavy-Duty Series," "Stainless Steel Series," "Two Stage Series," and "Specialty Series;"

E.  Vacuums labeled as having "2.5 Peak HP" or greater in the "Industrial Series" including "Single Stage Series," "Two-Stage Series," "Two-Stage Heavy Duty Series," "Pump Series," "Eagle Eye Series," "Commercial/ Jan/San/ Hotel Series," and "Specialty Series;"

F.  Vacuums labeled as having "2.5 Peak HP" or greater in the "Shop-Vac Premium Series" catalogue including:  "Shop-Vac Classic Series," "Shop-Vac High Performance Series," "Shop-Vac Stainless Steel Series," "Shop-Vac Portable

Series," "Shop-Vac All Around Series," "Shop-Vac Pump Vacs," "Shop-Vac

Blower Vacs," and "Shop-Vac Blower Vacs;" and

G. Vacuums labeled as having "2.5 Peak HP" or greater in the "Shop-Vac Consumer

Series" catalogue including: "Shop-Vac Quiet Series," "Shop-Vac Quiet Plus

Series," "Shop-Vac QSP Quiet Deluxe Series," "Shop-Vac Ultra Blower Vac

Series," "Pump-Vac Series," "Shop-Vac Wall Mount," and "HangOn by Shop-

Vac Series."

8.      Plaintiff reserves the right to amend this Complaint to add different or additional

defendants, including without limitation any officer, director, employee, supplier, or distributor

of Defendant who has knowingly and willfully aided, abetted, or conspired in the false and

deceptive conduct alleged herein.

## JURISDICTION AND VENUE

9.      This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(d)(2)(A)

because this case is a class action where the aggregate claims of all members of the proposed

class are in excess of $5,000,000.00, exclusive of interest and costs, there are over 100 members

of the putative class, and Plaintiff, as well as most members of the proposed class, is a citizen of

a state different from Defendant.

10.      Pursuant to 28 U.S.C. § 1391, this Court is the proper venue for this action

because a substantial part of the events, omissions, and acts giving rise to the claims herein

occurred in this District.  Also, Defendant Shop-Vac is incorporated in this District.  Moreover,

Defendant distributed, advertised, and sold the Vacuums to class members, which are the subject

of the present complaint, in this District.

<u>**FACTS COMMON TO ALL CLAIMS**</u>

**A.  <u>The Vacuums Are Uniformly Labeled And Marketed As Having Between "2.5 Peak HP" To "6.5 Peak HP"</u>**

11.     The Vacuums are commonly and uniformly labeled, packaged, marketed, and advertised with representations of horsepower ratings between "2.5 Peak HP" to "6.5 Peak HP:"



12.     However, these HP Claims are untrue and misleading, as the actual operating power and functionality of the Vacuums, under any condition, is only a small fraction of these representations:

| <u>HP Claim</u> | <u>Actual Max HP</u> | <u>% Difference</u> | <u>Electrical Rating, in Amps (at 120V)</u> | <u>Max Watts (<em><u>i.e.</u></em>, <u>Amps times 120V</u>)</u> |
|---|---|---|---|---|
| 2.5 | <u>**1.287**</u> | <u>**-48.5%**</u> | 8.0 amps | 960 watts |
| 3 | <u>**1.352**</u> | <u>**-54.9%**</u> | 8.4 amps | 1008 watts |
| 3.5 | <u>**1.368**</u> | <u>**-60.9%**</u> | 8.5 amps | 1020 watts |
| 4 | <u>**1.577**</u> | <u>**-60.6%**</u> | 9.8 amps | 1176 watts |
| 4.5 | <u>**1.593**</u> | <u>**-64.6%**</u> | 9.9 amps | 1188 watts |

| HP Claim | Actual Max HP | % Difference | Electrical Rating, in Amps (at 120V) | Max Watts (*i.e.*, Amps times 120V) |
|:---:|:---:|:---:|:---:|:---:|
| 5 | **1.818** | **-63.6%** | 11.3 amps | 1356 watts |
| 5.5 | **1.867** | **-66.1%** | 11.6 amps | 1392 watts |
| 6 | **1.899** | **-68.4%** | 11.8 amps | 1416 watts |
| 6.5 | **1.931** | **-70.3%** | 12.0 amps | 1440 watts |

### B. Horsepower Is A Commonly And Uniformly Understood And Defined Measure Of Power

13.     A horsepower is a common measure of the work power of a device.  Both normal consumers and technical experts understand and use horsepower as a standard unit of measurement for determining the work power, or power output, of a particular device.  The definition of 1 horsepower converted to electric terms is 745.7 watts.  For example, the equivalent of 2.5 horsepower is 1865 watts, and 6.5 horsepower is 4849 watts.  For an electrical device to output a particular work power, the device must draw, or input, an equivalent power from an electrical source such as a wall outlet or circuit.[3]

### C. Household Circuits In the United States Are Limited To A Particular Total Power Output In Watts

14.     Similar to a narrow pipe that limits the flow of water, wiring size limits the amount of electricity that can flow before the wire heats up and potentially catches fire.  As such, in the United States, residential and commercial wiring is strictly and uniformly regulated.  Residential circuits are normally limited to 15 amps in 120V circuits which means that the total

---

[3] Real world devices and circuitry are inefficient, and the work power for a device will always be less than the electric power input due to losses.  *See infra note* 5.  That said, the calculations in this complaint are highly conservative and over-estimate available power.

wattage (power) available from a standard wall outlet is 1800 watts (*i.e.*, 120V times 15 amps).[4] If a device, or a short circuit, tries to pull more power than the rating, a breaker (fuse) will cut power to the entire circuit.

15.     These power ratings are for the circuit as a whole, so in ordinary use, there may be other devices connected and using power, which would further reduce the amount of power for the vacuum before blowing the breaker (fuse).

16.     In the interest of simplicity, and as noted further in the Complaint, the power limit of 1800 watts from a household circuit is grossly exaggerated from actual use because it does not consider efficiency losses in the wiring, motor, or other sources which would reduce the wattage capabilities of the device considerably.[5]   As such, the calculations in this Complaint are highly conservative and over-estimate available power.   Even so, Defendant's Vacuums do not achieve "2.5 Peak HP" to "6.5 Peak HP," and in fact only deliver a small fraction of the claimed amount.

### D.  Household Receptacles In The United States Are Limited To A Particular Total Power Output In Watts

17.     The vast majority of household receptacles (outlets) in the United States are standardized NEMA 5-15, or equivalent, as defined by National Electrical Manufacturers Association ("NEMA").[6]   NEMA 5-15 plugs and receptacles are limited to 15 amps at 120V, and thus 1800 watts.[7]   All of the Vacuums are sold with NEMA 5-15 plugs.

---

[4] Some circuits in the United States offer 20 amps, which would be equivalent to 2400 watts of power.  These circuits are normally for use by permanent high-draw devices such as refrigerators and have a different plug and receptacle (NEMA 5-20), which is not found on the Vacuums.  In any case, the power specifications for the Vacuums, even ones with highest claim of "6.5 Peak HP," do not exceed 12 amps by Shop-Vac's own ratings in use on the labeling and packaging.

[5] Electric motors are commonly between 50-90% efficient in converting electric power to work power (horsepower), depending on the load, type, quality, design, and construction of the motor, wiring, circuity, and device.

[6] NEMA (National Electrical Manufacturers Association) is the largest trade association of electrical equipment manufacturers in the United States and sets standards for electrical equipment throughout the United States.

[7] For 20 amp circuits NEMA 5-20 plugs and receptacles, or equivalent, are used.  However, Shop-Vac's own power ratings for the Vacuums do not exceed 12 amps at 120V and the Vacuums have NEMA 5-15 plugs.

18.    Additionally, manufacturers, along with NEMA and the American National Standards Institute ("ANSI"),[8] routinely publish maximum horsepower ratings for standardized receptacles.  Not a single 15 amp receptacle has a rating above 0.5 horsepower.

19.    It is unsafe for a device to use more power than the receptacle it is designed for. As such, manufacturers, including Shop-Vac, could not design a vacuum that would draw more power than a household outlet is designed to provide.

**E.  Shop-Vac States A Contradictory "Electrical Rating" Which Shows That The Advertised Horsepower Cannot Be True**

20.    In Shop-Vac brochures, user manuals, and on the appliance itself, an "Electric Rating" is stated.[9]  For example, in connection with vacuums marked as "6.5 Peak HP," Shop-Vac uniformly lists an electric rating of 12 amps at 120V:



| Catalog | Capacity | Peak HP | UPC | Carton Dimensions | Cube | Shipping Weight | Cubic Feet per Minute (CFM) | Sealed Pressure | Air Watt | Electric Rating | Cord |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 9627810 | 16 U.S. Gal* 60.5 Liters* | 6.5* | 0 26282 10031 3 | 18¾" x 18¾" x 32" | 6.5 | 46 lbs. (20.9 kg) | 110* | 72* (inches of water) | 335* | 120V ~ 60Hz 12A | 18 ft. (5.5 m) |

---

[8] ANSI (American National Standards Institute) is one of the largest standardization organizations in the world with over 125,000 company members and 3.5 million members.
[9] This rating is also verified by the UL and is permanently marked on all the Vacuums.  *See infra* Parts F-H.



21.     Thus, the "6.5 HP" Vacuums, according to Shop-Vac itself, use a maximum 1440 watts (*i.e.*, 12 amps times 120V).  This is significantly less than the 4849 watts a true 6.5 horsepower motor requires.  As another example, Vacuums marked as "2.5 Peak HP" have an electric rating of 8 amps at 120V, which means these Vacuums use a maximum of 960 watts (*i.e.*, 8 times 120V).  This is significantly less than the 1865 watts a 2.5 horsepower motor requires.

22.     <u>The above calculation and comparison can be easily calculated for every model Vacuum, with one, uniform answer: the Vacuums do not, and cannot produce the claimed horsepower.</u>[10]

**F.  <u>UL Is A Highly Reputable Safety Certification Organization, And UL Certification Is All But Required To Sell Electrical Products In The United States</u>**

23.     Federal laws and governmental regulatory agencies such as OSHA, state and local laws, common distribution and purchasing contracts, and potential safeguards against tort liability, all but require product manufacturers and distributors, such as Shop-Vac, to test their

---

[10] *See supra* para. 12.

devices with a National Registered Testing Laboratory ("NTRL") for safety.  The most common

and ubiquitous NTRL is UL LLC (formally known as Underwriters Laboratories) ("UL"), a non-

profit and federally approved NTRL.

24.     UL, as an independent third-party organization, tests millions of products a year

in almost every industrial and consumer product category for safety.  UL creates and sets

standards for particular components, such as wiring, as well as "UL Standard[s]" for entire

product categories.  A UL Standard is a standardized testing regime formulated for a particular

type of similar products to ensure uniform safety for all devices.  When a device is sent to the

UL, and it passes the rigorous tests, the device becomes "UL Listed."  The company can then put

the UL mark on its product to show the certification.  As well, the company can sell the device in

jurisdictions requiring the certification (nearly the entire US market has some type of schema

requiring a NTRL, such as UL, certification).

25.     One such UL Standard is "UL 1017 STANDARD FOR SAFETY Vacuum,

Cleaners, Blower Cleaners, and Household Floor Finishing Machines."  According to UL

listings, the product packaging, and labeling, all of the models in every series of the Vacuums are

uniformly UL Listed and marked, and thus tested under UL 1017.

**G.   "UL 1017 STANDARD FOR SAFETY Vacuum, Cleaners, Blower Cleaners, And Household Floor Finishing Machines" Has Particular Safety Tests That Limit The Electrical Rating**

26.     UL 1017 tests a vacuum being certified in numerous testing condition that mimic

the most extreme real-world operating scenarios.  For instance, UL 1017 5.2 tests vacuums in

conditions of "[n]ormal load [which] shall be considered to be that load which approximates as

closely as possible the most severe conditions of normal use but is not a deliberate overload."

27.     As well, UL 1017 5.7 dictates a "Rating" requirement which requires the "input

current in amperes (and watts, if so marked) to the appliance shall not vary from the marked

current (and wattage) rating[11] by more than plus 10% and minus 15% when the equipment is operated under normal load[12] conditions."  This means that the highest power the device can ever draw, even in the "most severe conditions of normal use [that] is not a deliberate overload," has been tested and confirmed by the UL to be not more than 10% of the previously mentioned electrical rating Shop-Vac permanently stamps all of its products with.[13, 14]

### H.  Defendant Intentionally Mislabeled The Vacuums With False And Misleading "Peak HP" Claims

28.     By permanently marking the Vacuums with the UL-verified electrical rating, and publishing the electrical rating in their brochures, Shop-Vac knew that the HP Claims are false and misleading, yet still advertised, labeled, and packaged the Vacuums with the exaggerated horsepower claims.

29.     The Vacuums do not, and will never be able to, meet the power requirements required for the Vacuums' advertised horsepower, as is demonstrated by:  (1) the inability for household circuits to provide the necessary power required to meet the HP Claims; (2) the inability for household receptacles to provide the necessary power required to meet the HP Claims; (3) Shop-Vac's own electric rating not meeting the power requirements necessary for the HP Claims; (4) UL testing, certification, and marking demonstrating the maximum operating power of the device, under any conditions, does not meet the necessary power required to meet the HP Claims.

---

[11] This is the "electrical rating."

[12] UL dictates the normal load conditions are the "most severe conditions of normal use but is not a deliberate overload."

[13] The starting current for an electric motor is also one of the highest draw scenarios.  UL 1017 5.6, in short, requires that "[a]n appliance shall start and operate normally on a circuit protected by an ordinary … fuse having a current rating corresponding to that of the branch circuit to which the appliance should be connected … and the fuse … shall not trip."  Because the Vacuums are all designed and marked to operate on 120V at less than 15 amps, even at start, the Vacuums cannot pull more 1800 watts (i.e., 120V times 15 amps), which is less than the 1865 watts even a 2.5 horsepower motor requires.

[14] *See supra* para. 20-21.

30.     Simply put, Shop-Vac's horsepower claims are a farce.  It is physically impossible for any consumer to experience and use the horsepower claimed during use, under any conditions.  The true horsepower rating is only a small fraction of what is depicted on Defendant's labeling and packaging.

## CLASS ACTION ALLEGATIONS

31.     Pursuant to Fed. R. Civ. P. 23, Plaintiff seeks to represent a class defined as all persons in the United States who purchased a Shop-Vac Vacuum with a 2.5 or greater peak HP claim (the "Class").  Excluded from the Class are persons who made such purchase for the purpose of resale.

32.     Plaintiff also seeks to represent a subclass of all Class members who purchased the Vacuums in Minnesota (the "Minnesota Subclass").

33.     Members of the Class and Minnesota Subclass are so numerous that their individual joinder herein is impracticable.  On information and belief, members of the Class and Minnesota Subclass number in the tens or hundreds of thousands.  The precise number of Class members and their identities are unknown to Plaintiff at this time but may be determined through discovery.  Class members may be notified of the pendency of this action by mail and/or publication through the distribution records of Defendant and third-party retailers and vendors.

34.     Common questions of law and fact exist as to all Class members and predominate over questions affecting only individual Class members.  Common legal and factual questions include, but are not limited to: whether the HP Claims are false or misleading; whether Shop-Vac warranted the horsepower claim on the packaging and labeling; whether Defendant breached these warranties; and whether Defendant committed statutory and common law fraud by doing so.

35.     The claims of the named Plaintiff are typical of the claims of the Class and Minnesota Subclass in that the named Plaintiff purchased a Shop-Vac vacuum in reliance on the representations and warranties described above, and suffered a loss as a result of those purchases.

36.     Plaintiff is an adequate representative of the Class and Minnesota Subclass because his interests do not conflict with the interests of the Class members he seeks to represent, he has retained competent counsel experienced in prosecuting class actions, and he intends to prosecute this action vigorously.  The interests of Class members will be fairly and adequately protected by Plaintiff and his counsel.

37.     The class mechanism is superior to other available means for the fair and efficient adjudication of the claims of the Class and Minnesota Subclass members.  Each individual Class member may lack the resources to undergo the burden and expense of individual prosecution of the complex and extensive litigation necessary to establish Defendant's liability.  Individualized litigation increases the delay and expense to all parties and multiplies the burden on the judicial system presented by the complex legal and factual issues of this case.  Individualized litigation also presents a potential for inconsistent or contradictory judgments.  In contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court on the issue of Defendant's liability.  Class treatment of the liability issues will ensure that all claims and claimants are before this Court for consistent adjudication of the liability issues.

## <u>COUNT I</u>
### (Breach Of Express Warranty)

38.     Plaintiff hereby incorporates by reference the allegations contained in all preceding paragraphs of this complaint.

39.     Plaintiff brings this claim individually and on behalf of the members of the Class and Minnesota Subclass against Defendant.

40.     Defendant, as the designer, manufacturer, marketer, distributor, and/or seller, expressly warranted that the Vacuums outputted a claimed "2.5 Peak HP" to "6.5 Peak HP" in the HP Claims.

41.     In fact, the Vacuums do not, and cannot, output the horsepower in the HP Claims.

42.     As a direct and proximate cause of Defendant's breach of express warranty, Plaintiff and the Class have been injured and harmed because:  (a) they would not have purchased the Vacuums on the same terms if they knew that the HP Claims were not true; (b) they paid a price premium for the Vacuums due to the HP Claims; and (c) the Vacuums do not have the characteristics, ingredients, uses, benefits, or quantities as promised in that the claimed HP can never be achieved in actual use.

## COUNT II
### (Breach Of The Implied Warranty Of Merchantability)

43.     Plaintiff hereby incorporates by reference the allegations contained in all preceding paragraphs of this complaint.

44.     Plaintiff brings this claim individually and on behalf of the members of the Class and Minnesota Subclass against Defendant.

45.     Defendant, as the designer, manufacturer, marketer, distributor, and/or seller, affixed HP Claims to each Vacuum and impliedly warranted that the Vacuums outputted a claimed "2.5 Peak HP" to "6.5 Peak HP" in the HP Claims.

46.     Defendant breached the warranty implied in the contract for the sale of the Vacuums because they could not pass without objection in the trade under the contract description, the goods were not of fair average quality within the description, and the goods were

unfit for their intended and ordinary purpose because the Vacuums do not, and in fact, could never output the horsepower claimed during use by Class members as advertised.  As a result, Plaintiff and Class members did not receive the goods as impliedly warranted by Defendant to be merchantable.

47.     Plaintiff and Class members purchased the Vacuums in reliance upon Defendant's skill and judgment and the implied warranties of fitness for the purpose.

48.     The Vacuums were not altered by Plaintiff and Class members.

49.     The Vacuums were defective when they left the exclusive control of Defendant.

50.     Defendant knew that the Vacuums would be purchased and used without additional testing by Plaintiff and Class members.

51.     The Vacuums were defectively designed and unfit for their intended purpose, and Plaintiff and Class members did not receive the goods as warranted.

52.     As a direct and proximate cause of Defendant's breach of the implied warranty the Plaintiff and Class members have been injured and harmed because: (a) they would not have purchased the Vacuums on the same terms if they knew that the HP Claims were not true; (b) they paid a price premium for the Vacuums due to the HP Claims; and (c) the Vacuums do not have the characteristics, ingredients, uses, benefits, or quantities as promised in that the claimed HP can never be achieved in actual use.

## COUNT III
### (Unjust Enrichment)

53.     Plaintiff hereby incorporates by reference the allegations contained in all preceding paragraphs of this complaint.

54.     Plaintiff brings this claim individually and on behalf of the members of the Class and Minnesota Subclass against Defendant.

55.     Plaintiff and Class members conferred benefits on Defendant by purchasing the Vacuums.

56.     Defendant has been unjustly enriched in retaining the revenues derived from Plaintiff and Class members' purchases of the Vacuums.  Retention of those moneys under these circumstances is unjust and inequitable because Defendant misrepresented that the Vacuums outputted a claimed "2.5 Peak HP" to "6.5 Peak HP" in the HP Claims.  These misrepresentations caused injuries to Plaintiff and Class members because they would not have purchased the Vacuums at all, or on the same terms, if the true facts were known.

57.     Because Defendant's retention of the non-gratuitous benefits conferred on them by Plaintiff and Class members is unjust and inequitable, Defendant must pay restitution to Plaintiff and Class members for its unjust enrichment, as ordered by the Court.

## COUNT IV
### (Negligent Misrepresentation)

58.     Plaintiff hereby incorporates by reference the allegations contained in all preceding paragraphs of this complaint.

59.     Plaintiff brings this claim individually and on behalf of the members of the Class and Minnesota Subclass against Defendant.

60.     As discussed above, Defendant misrepresented that the Vacuums outputted a claimed "2.5 Peak HP" to "6.5 Peak HP" by virtue of the HP Claims.  Defendant had a duty to disclose the proper horsepower rating rather than misrepresented information.

61.     At the time Defendant made these representations, Defendant knew or should have known that these representations were false or made them without knowledge of their truth or veracity.

62.     At an absolute minimum, Defendant negligently misrepresented and/or negligently omitted material facts about the Vacuums.

63.     The negligent misrepresentations and omissions made by Defendant, upon which Plaintiff and Class members reasonably and justifiably relied, were intended to induce and actually induced Plaintiff and Class members to purchase the Vacuums.

64.     Plaintiff and Class members would not have purchased the Vacuums if the true facts about the HP Claims had been known.

65.     The negligent actions of Defendant caused damage to Plaintiff and Class members, who are entitled to damages and other legal and equitable relief as a result.

## COUNT V
**(Fraud)**

66.     Plaintiff hereby incorporates by reference the allegations contained in all preceding paragraphs of this complaint.

67.     Plaintiff brings this claim individually and on behalf of the members of the Class and Minnesota Subclass against Defendant.

68.     As discussed above, Defendant provided Plaintiff and Class members with false or misleading material information and failed to disclose material facts about the Vacuums, including but not limited to the fact that they do not, and cannot, output the claimed "2.5 Peak HP" to "6.5 Peak HP" in the HP Claims.  These misrepresentations and omissions were made with knowledge of their falsehood.

69.     The misrepresentations and omissions made by Defendant, upon which Plaintiff and Class members reasonably and justifiably relied, were intended to induce and actually induced Plaintiff and Class members to purchase the Vacuums.

70.     The fraudulent actions of Defendant caused damage to Plaintiff and Class members, who are entitled to damages and other legal and equitable relief as a result.

**COUNT VI**
**(Violation Of The New Jersey Consumer Fraud Act,**
**N.J.S.A. § 56:8-1, *et seq.*)**

71.     Plaintiff hereby incorporates by reference the allegations contained in all preceding paragraphs of this complaint.

72.     Plaintiff brings this claim individually and on behalf of the members of the Class against Defendant.

73.     Plaintiff and Class members have suffered an injury in fact and lost money or property as a result of Defendant's violations of New Jersey's Consumer Fraud Act ("NJCFA").

74.     The NJCFA protects consumers from "any unconscionable commercial practice, deception, fraud, false pretense, false promise, misrepresentation, or the knowing, concealment, suppression, or omission, in connection with the sale or advertisement of any merchandise …." N.J. Stat. Ann. § 56:8-2.

75.     Defendant misrepresented the Vacuums' output as "2.5 Peak HP" to "6.5 Peak HP" in the HP Claims to the consumer, when in fact the Vacuums do not, and cannot, output such power.

76.     Defendant engaged in unlawful conduct by deliberately and knowingly engaging in misrepresentations and false statements regarding the Vacuums, in the course of Defendant's business.  Specifically, Defendant knew or should have known that the Vacuums did not output "2.5 Peak HP" to "6.5 Peak HP."  However, Defendant failed to disclose this material fact to Plaintiff and the Class members at the time of purchase.

77.     Defendant has also engaged in unlawful conduct by willfully and knowingly suppressing and/or omitting information related to the Vacuums to consumers.  Specifically, Defendant purposefully and knowingly failed to disclose the Vacuums' true horsepower output to consumers, such as Plaintiff and the Class members, to secure the sale of the Vacuums at a premium price.  Defendant also failed to disclose the HP Claims during the limited warranty period to avoid having to perform their contractual duties under the warranty to repair all known defects.

78.     Defendant did not fully and truthfully disclose to their customers the true nature of the Vacuum's true horsepower capability, nor was it readily discoverable at the time of purchase.

79.     Defendant intended that Plaintiff and the Class members rely on the HP Claims, so that they would purchase the Vacuums.

80.     Accordingly, Defendant has engaged in unfair and deceptive trade practices, including representing that the Vacuums have characteristics, uses, benefits, and qualities which they do not have; representing that the Vacuums are of a particular standard and quality when they are not; advertising Vacuums with the intent to not sell them as advertised; and otherwise engaging in conduct likely to deceive.  Further, Defendant's acts and practices described herein offend established public policy because of the harm they cause to consumers, other sellers and manufacturers of products, and because Defendant fraudulently concealed the defective nature of the Vacuums from consumers.

81.     Defendant's actions as set forth above occurred in the conduct of trade or commerce.

82.     By engaging in the above-described practice and the actions and omissions herein alleged, Defendant has committed one or more unlawful acts in violation of the NJCFA.

83.     Plaintiff and Class members suffered an ascertainable loss caused by Defendant's misrepresentations because: (a) they would not have purchased the Vacuums on the same terms if the true facts concerning their horsepower had been known; (b) they paid a price premium due to the mislabeling of the Vacuums' horsepower; (c) the Vacuums did not perform as promised; and (d) Plaintiff and Class members have suffered and will continue to suffer damages by underperforming Vacuums from what was represented.

84.     As a result of Defendant's unlawful conduct, Plaintiff and Class members were injured and suffered damages, and are entitled to recover damages, as well as the declaratory and injunctive relief, as determined by the Court, pursuant to New Jersey Law, and as set forth in the Prayer for Relief.

## COUNT VII
**(Violation Of The Pennsylvania Unfair Trade Practices and Consumer Protection Law, 73  P.S. § 201–1, *et seq.*)**

85.     Plaintiff hereby incorporates by reference the allegations contained in all preceding paragraphs of this complaint.

86.     Plaintiff brings this claim individually and on behalf of the members of the Class against Defendant.

87.     The Plaintiff and Class members are persons who purchased the Vacuums primarily for personal, family, or household purposes and suffered an ascertainable loss of money as a result of the Defendant's "method, act or practice declared unlawful by" the UTPCPL. 73 P.S. § 201-9.2.

88.     Defendant has a statutory duty pursuant to the UTPCPL, which prohibits "unfair or deceptive acts or practices in the conduct of any trade or commerce."  73 P.S. § 201-3.

89.     Pursuant to the UTPCPL, "unfair or deceptive acts or practices" include "[r]epresenting that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits or quantities that they do not have."  73 P.S. § 201-2(4)(v).

90.     Defendant specifically violated § 201-2(4)(v), in that:

a.   Defendant designed, formulated, manufactured, inspected, packaged, labeled, distributed, supplied, and/or sold the Vacuums when it knew, or should have known, that the Vacuums do not, and cannot, output the "2.5 Peak HP" to "6.5 Peak HP" claimed in the HP Claims;

b.   Defendant represented that the Vacuums outputted the claimed "2.5 Peak HP" to "6.5 Peak HP."  The HP Claim was material in that Plaintiff and Class members relied on the representation and formed an expectation;

c.   Defendant knew that the Vacuums could never output "2.5 Peak HP" to "6.5 Peak HP" in actual use.  Defendant also knew this truth to be unknown to, and not easily discovered by, the Plaintiff and the Class and would be contrary to their ordinary, foreseeable, and reasonable expectations concerning the performance of the Vacuums;

d.   Defendant was able to command a greater price, which Plaintiff and the Class paid, than it otherwise could have due to the HP Claims; and

e.   Defendant failed to disclose Plaintiff and the Class that the Vacuums did not output the claimed "2.5 Peak HP" to "6.5 Peak HP" in actual use.

91.     Additionally, pursuant to the UTPCPL, "unfair or deceptive acts or practices" include "[r]epresenting that the goods or services are of a particular standard, quality or grade … if they are of another." 73 P.S. § 201-2(4)(vii).

92.     Defendant specifically violated § 201-2(4)(vii), in that:

    a.   Defendant designed, formulated, manufactured, inspected, packaged, distributed, labeled, supplied, and/or sold the Vacuums when it knew, or should have known, that the Vacuums do not, and cannot, output the claimed "2.5 Peak HP" to "6.5 Peak HP" as in the HP Claims;

    b.   Defendant represented that the Vacuums outputted the claimed "2.5 Peak HP" to "6.5 Peak HP."  The HP Claim was material in that Plaintiff and Class members relied on the representation and formed an expectation;

    c.   Defendant knew that the Vacuums could never output the claimed "2.5 Peak HP" to "6.5 Peak HP" in actual use.  Defendant also knew this truth to be unknown to, and not easily discovered by, the Plaintiff and the Class and would be contrary to their ordinary, foreseeable, and reasonable expectations concerning the performance of the Vacuums;

    d.   Defendant was able to command a greater price, which Plaintiff and the Class paid, than it otherwise could have due to the HP Claims; and

    e.   Defendant failed to disclose to Plaintiff and the Class that the Vacuums did not output the claimed "2.5 Peak HP" to "6.5 Peak HP" in actual use.

93.     Defendant's acts and omissions regarding the Vacuums, as described herein, were likely to deceive, and did deceive, Plaintiff and Class members who would not have purchased, or would have paid less for, the Vacuums had the true horsepower output been known.

94.     As a direct and proximate result of Defendant's unconscionable, unfair, and deceptive acts, practices, and omissions alleged herein, Plaintiff and the Class members have been damaged and injured by Defendant and are entitled to recover damages.  Pursuant to the UTPCPL, damages for each person includes "actual damages or one hundred dollars ($100), whichever is greater."  73 P.S. § 201-9.2.  Also "[t]he court may, in its discretion, award up to three times the actual damages sustained, but not less than one hundred dollars ($100), and may provide such additional relief as it deems necessary or proper.  The court may award to the plaintiff, in addition to other relief provided in this section, costs and reasonable attorney fees." 73 P.S. § 201-9.2.

95.     As a result of Defendant's unlawful conduct, Plaintiff and Class members were injured and suffered damages, and are entitled to recover damages including statutory damages, as well as the declaratory and injunctive relief, as determined by the Court, pursuant to Pennsylvania Law, and as set forth in the Prayer for Relief.

## COUNT VIII
### (Violation Of The Minnesota Prevention of Consumer Fraud Act, Minn. Stat. §§ 325F.68-.70, *et seq*.)

96.     Plaintiff hereby incorporates by reference the allegations contained in all preceding paragraphs of this complaint.

97.     Plaintiff brings this claim individually and on behalf of the Minnesota Subclass against Defendant.

98.     The MPCFA prohibits "[t]he act, use, or employment by any person of any fraud, false pretense, false promise, misrepresentation, misleading statement or deceptive practice, with the intent that others rely thereon in connection with the sale of any merchandise, whether or not any person has in fact been misled, deceived, or damaged thereby …."  Minn. Stat. § 325F.69(1).

99.     Plaintiff, the Minnesota Subclass members, and Shop-Vac are all "persons" within the meaning of the MPCFA, Minn. Stat. § 325F.68.

100.     The Vacuums are "merchandise" within the meaning of the MPCFA, Minn. Stat. § 325F.68 and were sold to the Plaintiff and Minnesota Subclass members.

101.     Shop-Vac's deceptive scheme was carried out in Minnesota and the Vacuums were purchased in Minnesota and affected Plaintiff and the Minnesota Subclass members.

102.     Defendant's omissions and misrepresentations set forth in this Complaint are material in that they relate to information that would naturally affect the purchasing decisions or conduct of purchasers, including Plaintiff and Minnesota Subclass members, regarding whether or not to purchase the Vacuums.

103.     Shop-Vac engaged in deceptive and fraudulent practices related to the sale of its Vacuums, including labeling, packaging, selling, and/or offering for sale the Vacuums with deceptive claims of "2.5 Peak HP" to "6.5 Peak HP" in the HP Claims.  The HP Claims are deceptive, untrue, and/or misleading because the actual operating power and functionality of the Vacuums is much lower.  Shop-Vac failed to disclose, suppressed, omitted, or concealed this known material fact, to the detriment of Plaintiff and Minnesota Subclass.  This constitutes the use of fraud, false pretenses, false promises, misrepresentations, misleading statements, and/or deceptive practices, and thus constitutes multiple separate violations of Minn. Stat. § 325F.69.

104.     Shop-Vac continues to affirmatively misrepresent and conceal from the consuming public the truth about the Vacuums, namely that the Vacuums do not have "2.5 Peak HP" to "6.5 Peak HP" in the HP Claims.  This constitutes the use of fraud, false pretenses, false promises, misrepresentations, misleading statements, and/or deceptive practices, and thus constitutes multiple separate violations of Minn. Stat. § 325F.69.

105.    Shop-Vac intentionally and/or knowingly misrepresented the true horsepower output of the Vacuums so that Plaintiff and Minnesota Subclass members would purchase the Vacuums.

106.    Shop-Vac intended for the Plaintiff and Minnesota Subclass to rely on, and accept as true, these false and/or misleading advertisements and misrepresentations with respect to the HP Claims in deciding whether to purchase a Shop-Vac vacuum.  Shop-Vac frequently, negligently and/or intentionally concealed and/or failed to disclose the true characteristics of the Vacuums for the purpose of inducing Plaintiff and the Class to rely thereon in purchasing the Vacuums.

107.    Shop-Vac's unfair or deceptive acts or practices were and are likely to deceive reasonable consumers about the Vacuums' true horsepower output and, by extension, the true value of the Vacuums.

108.    Plaintiff and the Class relied on, and were in fact deceived by, Defendant's advertisements and representations with respect to the horsepower output of the Vacuums in the HP Claims when deciding to purchase them over competitors' vacuums.

109.    Plaintiff and Minnesota Subclass were injured in fact and suffered actual damages as a result of their reliance on Defendant's advertisements and representations with respect to the horsepower output of the Vacuums, namely the HP Claims.  Defendant's wrongful conduct was the direct and proximate cause of the injuries to Plaintiff and Minnesota Subclass.  Because of Defendant's fraudulent conduct, the value of the Vacuums has been greatly diminished, as vacuums with more horsepower are worth more than an otherwise comparable vacuums with less horsepower.  Through these deceptive statements and misleading omissions, Shop-Vac violated

Minn. Stat. § 325F.69 and directly and proximately caused damage to Plaintiff and the Class members.

110.    Separate from, and in addition to, actual damages, Plaintiff and Minnesota Subclass members' expectations were frustrated as a result of Defendant's omissions and misrepresentations, and they did not receive what was expected, and therefore suffered an injury. Plaintiff and Minnesota Subclass members are thus entitled to recover the difference between the actual value of the Vacuums and the value of the Vacuums as represented, *i.e.*, the price premium solely attributable to the presence or absence of the false and misleading HP Claims.

111.    Had Plaintiff and Minnesota Subclass members known about the Vacuums' true horsepower output they would not have purchased the Vacuums, or would have paid less for them.

112.    Shop-Vac's conduct complained of herein is unfair and deceptive, and has therefore harmed the Plaintiff and Minnesota Subclass members, as well as the public.  This litigation thus serves a public benefit.  Additionally, there is ongoing harm to the public, the Plaintiff, and Minnesota Subclass members because the deceptive and misleading HP Claims are still in use by Shop-Vac today.  There is a strong public interest in preventing fraud and deceptive practices by manufacturers, sellers, and merchants for truth in the interest of a free and truthful market.

113.    Shop-Vac's unlawful conduct is continuing, with no indication that Defendant intends to cease this fraudulent course of conduct.  This action benefits the public by addressing the proper advertising and claims on consumer products in the interest of a free marketplace and truthful advertising.  Shop-Vac's unlawful conduct has harmed, and is harming, the public to this day.

114.     Plaintiff and Minnesota Subclass have been damaged and injured by, on account of, and as a direct, proximate, and foreseeable result of Shop-Vac's violations of this statute, in an amount to be determined at trial.

115.     As a result of Defendant's unlawful conduct, Plaintiff and Minnesota Subclass were injured and suffered damages, and are entitled to recover damages, as well as the declaratory and injunctive relief, as determined by the Court, pursuant to Minnesota law, including Minn. Sat 8.31, subd. 1 and 3a. and 325D.45 and as set forth in the Prayer for Relief.

### COUNT IX
**(Violation Of The Minnesota Uniform Deceptive Trade Practices Act,
Minn. Stat. § 325D.43-48, *et seq*.)**

116.     Plaintiff hereby incorporates by reference the allegations contained in all preceding paragraphs of this complaint.

117.     Plaintiff brings this claim individually and on behalf of the Minnesota Subclass against Defendant.

118.     Shop-Vac's deceptive scheme was carried out in Minnesota and the Vacuums were purchased in Minnesota and affected Plaintiff and the Minnesota Subclass members.

119.     The MDTPA prohibits unlawful trade practices.  The prohibited trade practices include, in part, advertising goods or services with intent to sell them not as advertised and engaging in conduct which creates a likelihood of confusion or misunderstanding.  Minn. § 325D.44(9).

120.     Shop-Vac violated the MDTPA which prohibits unlawful trade practices including deceptive acts in the course of business.

121.     Shop-Vac violated Minn. Stat. § 325D.44(5) by representing that the Vacuums had characteristics, uses, and benefits that they did not have, including but not limited to the fact

that they do not, and cannot, output the claimed "2.5 Peak HP" to "6.5 Peak HP" set forth in the HP Claims.

122.    Shop-Vac violated Minn. Stat. § 325D.44(7) by representing that the Vacuums were of a particular standard or quality when they did not have the particular standard or quality advertised, including but not limited to the fact that they do not, and cannot, output the claimed "2.5 Peak HP" to "6.5 Peak HP" set forth in the HP Claims.

123.    Shop-Vac violated Minn. Stat. § 325D.44(13) by engaging in conduct which created a likelihood of confusion or of misunderstanding among Plaintiff and Minnesota Subclass members as to the quality, abilities, and specifications of the Vacuums, including but not limited to the fact that they do not, and cannot, output the claimed "2.5 Peak HP" to "6.5 Peak HP" set forth in the HP Claims.

124.    Shop-Vac knew, or should have known, that the Vacuums did not output the claimed "2.5 Peak HP" to "6.5 Peak HP" set forth in the HP Claims.  The falsehood of the advertised horsepower is a material fact; had Plaintiff and Minnesota Subclass members known about it, they would have either not purchased the Vacuums or would have paid less for them. Shop-Vac violated Minn. Stat. § 325D.44 through this material omission.  Shop-Vac's misrepresentations and omissions were made to the public at large, affecting tens of thousands of Class members who purchased or shopped and considered the Vacuums and who were economically injured by not receiving the product they bargained for.

125.    Shop-Vac willfully engaged in the conduct in violation of Minn. Stat. § 325D.44 knowing it to be deceptive.

126.    Shop-Vac intended that Plaintiff and Minnesota Subclass members would rely on the deception by purchasing the Vacuums, unaware of the undisclosed material facts.  This conduct constitutes consumer fraud.

127.    As a direct and proximate result of Shop-Vac's deceptive conduct in violation of Minn. Stat. § 325D.44, et seq., Plaintiff and Minnesota Subclass members have been damaged.

128.    Shop-Vac's unlawful conduct is continuing, with no indication that Defendant intends to cease this fraudulent course of conduct.  This action benefits the public by addressing the proper advertising and claims on consumer products in the interest of a free marketplace and truthful advertising.  Shop-Vac's unlawful conduct has harmed, and is harming, the public to this day.

129.    Shop-Vac failed to disclose and in fact concealed to the public what it knew about the true horsepower rating of the vacuums.

130.    Plaintiff has been damaged and injured by, on account of, and as a direct, proximate, and foreseeable result of Shop-Vac's violations of this statute, in an amount to be determined at trial.

131.    As a result of Defendant's unlawful conduct Plaintiff and Minnesota Subclass members were injured and suffered damages, and are entitled to recover damages, as well as the declaratory and injunctive relief, as determined by the Court, pursuant to Minnesota law, including Minn. Sat 8.31, subd. 1 and 3a. and 325D.45 and as set forth in the Prayer for Relief.

## COUNT X
### (Violation Of The Minnesota Unlawful Trade Practices Act, Minn. Stat § 325D.13, *et seq*.)

132.    Plaintiff hereby incorporates by reference the allegations contained in all preceding paragraphs of this complaint.

133.    Plaintiff brings this claim individually and on behalf of the Minnesota Subclass against Defendant.

134.    Minnesota Statute § 325D.13 provides that "no person shall, in connection with the sale of merchandise, knowingly misrepresent, directly or indirectly, the true quality, ingredients or origin of such merchandise."

135.    By engaging in the conduct described herein, Defendant violated and continues to violate Minn. Stat. § 325D.13.

136.    Shop-Vac's deceptive scheme was carried out in Minnesota and the Vacuums were purchased in Minnesota and affected Plaintiff and Minnesota Subclass members.

137.    Shop-Vac knowingly misrepresented and concealed the true quality of the Vacuums in connection with the sale of the merchandise.

138.    Shop-Vac knowingly misrepresented that the Vacuums have "2.5 Peak HP" to "6.5 Peak HP" in the HP Claims.

139.    Shop-Vac's omissions and misrepresentations had the tendency or capacity to deceive or mislead (and did deceive and mislead) Plaintiff and Minnesota Subclass members.

140.    Shop-Vac's omissions and misrepresentations were material because they related to facts that would naturally affect the conduct of purchasers and that of a reasonable person or consumer, including Plaintiff and Minnesota Subclass members, would have considered important in deciding whether to purchase Defendant's Vacuums.

141.    Shop-Vac caused the Vacuums to enter into interstate commerce.

142.    Shop-Vac's unlawful conduct is continuing, with no indication that Defendant intends to cease this fraudulent course of conduct.  This action benefits the public by addressing the false and misleading labeling and advertising of the Vacuums in the interest of a free

marketplace and truthful advertising.  Shop-Vac's unlawful conduct has harmed, and is harming, the public to this day.

143.    As a result of Defendant's unlawful conduct, Plaintiff and Minnesota Subclass members were injured and suffered damages, and are entitled to recover damages, as well as the declaratory and injunctive relief, as determined by the Court, pursuant to Minnesota law, including Minn. Sat 8.31, subd. 1 and 3a. and 325D.45 and as set forth in the Prayer for Relief.

## COUNT XI
**(Violation Of The Minnesota False Statement In Advertising Act,
Minn. Stat. § 325F.67, *et seq.*)**

144.    Plaintiff hereby incorporates by reference the allegations contained in all preceding paragraphs of this complaint.

145.    Plaintiff brings this claim individually and on behalf of the Minnesota Subclass against Defendant.

146.    Shop-Vac's deceptive scheme was carried out in Minnesota and the Vacuums were purchased in Minnesota and affected Plaintiff and Minnesota Subclass members.

147.    Minnesota's False Statement in Advertising Act ("FSAA"), Minn. Stat. §325F.67, provides a cause of action to "any person, firm, corporation, or association" who purchases goods or services through advertising which "contains any material assertion, representation, or statement of fact which is untrue, deceptive, or misleading."

148.    Where, as here, Plaintiff's claims inure to the public benefit, Minnesota's private-attorney general statute, Minn. Stat. § 8.31, subdiv. 3a, allows individuals who have been injured through a violation of the FSAA to bring a civil action and recover damages, together with costs and disbursements, including reasonable attorneys' fees.

149.    By engaging in the conduct herein, Defendant violated and continues to violate Minn. Stat. § 325F.67 and the similar laws of other states.

150.    Defendant's misrepresentations, knowing omissions, and use of other deceptive business practices include, by way of example:

a.    Defendant's fraudulent, misleading, and/or deceptive statements relating to the true characteristics, standards, quality, and grade of the Vacuums, namely the HP Claims;

b.    Defendant's omission, and knowledge of, the true horsepower output of the Vacuums; and

c.    Defendant's concealment of the Vacuum's actual horsepower output.

151.    Defendant and its agents and distributors also made untrue, deceptive, and/or misleading assertions and representations about the Vacuums by making and repeating the various statements about the alleged quality of the Vacuums referenced herein.

152.    As a result of Defendant's conduct, Plaintiff and Minnesota Subclass members have suffered actual damages in that they purchased a Vacuum, as described herein, that was misrepresented and falsely advertised.  Plaintiff and Minnesota Subclass members are thus entitled to recover the difference between the actual value of the Vacuums and the value of the Vacuums as represented, *i.e.*, the price premium solely attributable to the presence or absence of the false and misleading HP Claims.  There is an association between Defendant's acts and omissions as alleged herein and the damages suffered by Plaintiff and the Class members.

153.    As a result of Defendant's untrue, deceptive, and misleading assertions and representations about the Vacuums, Plaintiff and Minnesota Subclass members have and will continue to suffer damages that include, without limitation, consequential and incidental damages.

34

154.    Shop-Vac's unlawful conduct is continuing, with no indication that Defendant intends to cease this fraudulent course of conduct.  This action benefits the public by addressing the false and misleading labeling and advertising of the Vacuums in the interest of a free marketplace and truthful advertising.  Shop-Vac's unlawful conduct has harmed, and is harming, the public to this day.

155.    As a result of Defendant's unlawful conduct, Plaintiff and Minnesota Subclass members were injured and suffered damages, and are entitled to recover damages, as well as the declaratory and injunctive relief, as determined by the Court, pursuant to Minnesota law, including Minn. Sat 8.31, subd. 1 and 3a. and 325D.45 and as set forth in the Prayer for Relief.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, individually and on behalf of all others similarly situated, seeks judgment against Defendant, as follows:

a.      For an order certifying the nationwide Class and the Minnesota Subclass under Rule 23 of the Federal Rules of Civil Procedure and naming Plaintiff as a representative of the Class and Minnesota Subclass and Plaintiff's attorneys as Class Counsel to represent the Class and Minnesota Subclass members;

b.      For an order declaring the Defendant's conduct violates the statutes referenced herein;

c.      For an order finding in favor of Plaintiff, the nationwide Class, and the Minnesota Subclass on all counts asserted herein;

d.      For compensatory, statutory, and punitive damages in amounts to be determined by the Court and/or jury;

e.      For prejudgment interest on all amounts awarded;

f.      For an order of restitution and all other forms of equitable monetary relief;

g.      For injunctive relief as pleaded or as the Court may deem proper; and

h.      For an order awarding Plaintiff, the Class, and Minnesota Subclass their reasonable attorneys' fees, expenses, and costs of suit.

## JURY DEMAND

Plaintiff demands a trial by jury on all causes of action and issues so triable.


Dated:  July 9, 2019                              Respectfully submitted,

                                                  **BURSOR & FISHER, P.A.**

                                                  By:_____ */s/ Frederick J. Klorczyk III*_____
                                                  Frederick J. Klorczyk III
                                                  Neal J. Deckant (*pro hac vice* forthcoming)
                                                  1990 North California Blvd., Suite 940
                                                  Walnut Creek, CA 94596
                                                  Telephone: (925) 300-4455
                                                  Facsimile:  (925) 407-2700
                                                  E-Mail:  fklorczyk@bursor.com
                                                              ndeckant@bursor.com

                                                  *Attorneys for Plaintiff*

**EXHIBIT A**

# BURSOR & FISHER

P.A.

1990 N. CALIFORNIA BLVD., SUITE 940
WALNUT CREEK, CA 94596
www.bursor.com

FREDERICK J. KLORCZYK III
Tel: 925.300.4455
Fax: 925.407.2700
fklorczyk@bursor.com

June 28, 2019

***Via Certified Mail – Return Receipt Requested***

Shop-Vac Corporation
2323 Reach Road
P.O. Box 3307
Williamsport, PA 17701

Re:    *Notice And Demand Letter Pursuant To U.C.C. §§ 2-313, 2-314, 2-607; The New Jersey Consumer Fraud Act ("NJCFA"); The Pennsylvania Unfair Trade Practices and Consumer Protection Law ("UTPCPL"); The Minnesota Prevention Of Consumer Fraud Act ("MPCFA"); The Minnesota Uniform Deceptive Trade Practices Act ("MDTPA"); The Minnesota Unlawful Trade Practices Act ("MUTPA"); And The Minnesota False Statement In Advertising Act ("MFSAA")*

To Whom It May Concern:

This letter serves as a preliminary notice and demand for corrective action by Shop-Vac Corporation ("Shop-Vac") pursuant to U.C.C. § 2-607(3)(a) concerning breaches of express and implied warranties related to our client, Kevin Johnson, and a class of all similarly situated purchasers (the "Class") of Shop-Vac brand vacuums (collectively, the "Vacuums") claiming that the appliances can purportedly achieve "2.5 Peak HP," "3.0 Peak HP," "4.5 Peak HP," "5.0 Peak HP," "5.5 Peak HP," "6.0 Peak HP," or "6.5 Peak HP" (collectively, the "HP Claims"). This letter also serves as a notice of violation of the New Jersey Consumer Fraud Act, N.J.S.A. § 56:8-1, *et seq.* ("NJCFA"), the Pennsylvania Unfair Trade Practices and Consumer Protection Law, 73 P.S. § 201–1, *et seq.* ("UTPCPL"), the Minnesota Prevention of Consumer Fraud Act, Minn. Stat. §§ 325F.68-.70, *et seq.* ("MPCFA"), the Minnesota Uniform Deceptive Trade Practices Act, Minn. Stat. § 325D.43-48, *et seq.* ("MDTPA"), the Minnesota Unlawful Trade Practices Act, Minn. Stat. § 325D.13, *et seq.* ("MUTPA"), the Minnesota False Statement in Advertising Act, Minn. Stat. § 325F.67, *et seq.* ("FSAA"), and all other applicable federal and state laws.

Our client purchased a "Shop-Vac® 16 Gallon 6.5 Peak HP Stainless Steel Contractor Wet Dry Vac," which was labeled as having "6.5 Peak HP." However, it is physically impossible for any of the Vacuums to achieve a horsepower output anywhere close to Shop-Vac's HP Claims. In fact, the true horsepower of the Vacuums is only a small fraction of the HP Claims. Accordingly, Shop-Vac breached express and implied warranties made to our client and

BURSOR&FISHER
P.A.

the Class and violated the consumer protection statutes reference above. *See* U.C.C. §§ 2-313, 2-314.

On behalf of our client and the Class, we hereby demand that Shop-Vac immediately (1) issue a mandatory recall of the Vacuums, and (2) make full restitution to all purchasers of the Vacuums of all purchase money obtained from sales thereof.

We also demand that Shop-Vac preserve all documents and other evidence which refer or relate to any of the above-described practices including, but not limited to, the following:

1.   All documents concerning the design, packaging, labeling, and manufacturing process for the Vacuums;

2.   All tests of the Vacuums, whether performed by Shop-Vac or any third-party entities;

3.   All documents concerning the pricing, advertising, marketing, and/or sale of the Vacuums;

4.   All communications with customers involving complaints or comments concerning the Vacuums;

5.   All documents concerning communications with any retailer involved in the marketing or sale of the Vacuums;

6.   All documents concerning communications with federal or state regulators concerning the Vacuums; and

7.   All documents concerning the total revenue derived from sales of the Vacuums.

If you contend that any statement in this letter is inaccurate in any respect, please provide us with your contentions and supporting documents immediately upon receipt of this letter.

Please contact me right away if you wish to discuss an appropriate way to remedy this matter.  If I do not hear from you promptly, I will take that as an indication that you are not interested in doing so.

Sincerely,

Frederick J. Klorczyk III